Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES,  NATIVE ECOSYSTEMS COUNCIL<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>LEANNE MARTEN, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, and UNITED STATE FISH & WILDLIFE SERVICE, an agency of the U.S. Department of the Interior,<br><br>　　　　　Defendants. | CV-15-99-M-DLC<br><br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

# I. INTRODUCTION

1.  This is a civil action for judicial review under the citizen suit provision of the Endangered Species Act and the Administrative Procedure Act of the U.S. Forest Service's (Forest Service) and U.S. Fish and Wildlife Service's (FWS) authorizations, analyses, and lack thereof related to and regarding the Greater Red Lodge Project (Project) on the Custer National Forest (Forest), and the Custer National Forest Land and Resource Management Plan (Forest Plan). Pursuant to Fed.R.Civ.P. 15(a)(2), with written consent of the opposing parties, Plaintiffs file this First Amended Complaint.

2.  Plaintiffs Alliance for the Wild Rockies and Native Ecosystems Council attest that the decisions approving the challenged authorizations, analyses, and lack thereof are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.  Defendants' actions or omissions violate the National Environmental Policy Act (NEPA), 42 U.S.C. 4331 *et seq.*, the National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.*, the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*

4.  Plaintiffs request that the Court set aside the Project decision pursuant to 5 U.S.C. § 706(2)(A) and 16 U.S.C. § 1540(g) and enjoin implementation of

the Project.

5.   Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and the Endangered Species Act, 16 U.S.C. § 1540(g)(4), and such other relief as this Court deems just and proper.

## II.  JURISDICTION

6.   This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

7.   An actual controversy exists between Plaintiffs and Defendants.  Plaintiffs' members use and enjoy the Custer National Forest for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities.  Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

8.   The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants implement the Project.  These are actual, concrete

2

injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, ESA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706.

9.   Plaintiffs sent a notice of intent to sue under the ESA on May 21, 2015. Plaintiffs sent an additional notice of intent to sue under the ESA on September 29, 2015, which was received by the government on October 5, 2015.  Thus, Plaintiffs have complied with the 60 day notice requirement for claims under the ESA, and this Court has jurisdiction to review Plaintiffs' ESA claims.

10.  Plaintiffs submitted timely written comments and objections concerning the Project in the available administrative review process, thus they have exhausted administrative remedies.  Defendants' review and rejection of Plaintiffs' objections was the final administrative action of the U.S. Department of Agriculture Forest Service.  Thus, the Court has jurisdiction to review Plaintiffs' APA claims.

### III. VENUE

11.  Venue in this case is proper under 28 U.S.C. § 1391(e) and LR 3.3(a)(1). Defendant Marten resides within the Missoula Division of the United States District Court for the District of Montana.

## IV. PARTIES

12. Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Custer National Forest. Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems as set forth below. Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

13. Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of natural resources on public lands in the Northern Rockies. Its members use and will continue to use the Custer National Forest for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding,

and cross-country skiing.  The Forest Service's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Custer National Forest, including the Project area.  Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

14.    Defendant LEANNE MARTEN is the Regional Forester for the Northern Region/Region One of the U.S. Forest Service, and in that capacity is charged with ultimate responsibility for ensuring that decisions made at each National Forest in the Northern Region, including the Custer National Forest, are consistent with applicable laws, regulations, and official policies and procedures.

15.    Defendant UNITED STATES FOREST SERVICE (Forest Service) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Custer National Forest.

16.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an administrative agency within the U.S. Department of Interior and is responsible for lawful management of species listed under the Endangered Species Act.

## V.  FACTUAL ALLEGATIONS

17.     The Forest Service signed the Records of Decision authorizing the Project

and the construction of Nichols Creek Road on May 19, 2015.

18.     The agency chose to implement Alternative 3 Modified for the Red Lodge

Creek portion of the Project area, and Alternative 2 Modified for the

Willow-Nichols Creek portion of the Project area.

PROJECT AREA

19.     The Project area is located in the Beartooth Mountains in the Greater

Yellowstone Area, in a mountainous region of south central Montana, located

2.5 - 15 miles west of Red Lodge, Montana.

20.     The Project area encompasses West Red Lodge Creek, Nichols Creek, and

Willow Creek.  Portions of the Project area fall within five subwatersheds:

Butcher Creek, Willow Creek-Clarks Fork Yellowstone, Upper Red Lodge

Creek, West Red Lodge Creek, and Lower West Fork Rock Creek

21.     Butcher Creek is listed under the Clean Water Act through much of its length

for a variety of impairments.  Both Willow Creek and West Red Lodge Creek

are currently listed as impaired for sediment/siltation.

22.     The Project area includes roughly 21,871 acres (10,275 acres in Red Lodge

Creek and 11,596 in Willow/Nichols Creek).

23.     The Project area is directly adjacent to the Absaroka-Beartooth Wilderness

and two designated inventoried roadless areas:  Burnt Mountain and Red Lodge Creek-Hellroaring.

24.   The Project area overlaps the current Upper Hogan, Burnt Fork, Butcher Creek, and Hogan Creek grazing allotments

25.   The ecosystem in the Project area is a north-facing forest that experiences 25 inches or more of moisture annually.

26.   Forested stands in the Project area are comprised predominately of mature lodgepole pine.  The majority of the lodgepole pine is about 100 years old, and many stands proposed for logging contain "considerable densities of large diameter trees."  Spruce, subalpine fir and Douglas fir are regenerating and establishing underneath the lodgepole pine, creating multiple canopy layers.

27.   The Project area provides habitat for grizzly bears and elk, is designated critical habitat for lynx, and contains two active occupied goshawk nests.

28.   The town of Red Lodge, which is 2.5 - 15 miles from the Project area, has become a tourist destination due to its outdoor recreation opportunities.

29.   The Project area is within Carbon County.  37% of private employment in Carbon County is dependent on the travel and tourism industry; less than 1% of the economy is dependent on logging.

PROJECT & IMPACTS/ANALYSIS

30.   The Project authorizes 1,051 acres of commercial logging, and an additional 756 acres of noncommercial burning and tree removal.

31.   The commercial logging for the Project includes over 500 acres of clearcutting of mature lodgepole pine forest.

32.   The Project authorizes the temporary construction, re-construction, or maintenance of 19 miles of logging roads.

33.   Some of these "roads" are currently trails that are not passable by vehicles.

34.   Road "reconstruction" may include widening roads, reconstructing existing turnouts, constructing new turnouts, road realignments (i.e. building the road into new areas and abandoning the old segments) including vegetation and tree removal.

35.   The Project also changes the Beartooth Travel Plan by reversing the Travel Plan decision to decommission 1.5 miles of roads in the area, and instead opening those roads for logging operations.

36.   The Project EIS also discloses that the Nichols Creek road would be reconstructed and opened for public motorized use for five years.

37.   The Project purports to "passively" "decommission" 3.9 miles of roads that have already revegetated and were already slated for decommissioning under the Beartooth Travel Plan.  Passive decommissioning means that the agency will take no action on the ground to physically decommission the roads.

38.    This Project authorizes a site specific Forest Plan amendment to exempt

       clearcut logging in occupied goshawk habitat from the Forest Plan standard to

       "maintain and improve" habitat for  mature forest species (Plan Amendment

       45).  The Forest Service admits that there is a potential that the two goshawk

       nest sites in the Project area may not be used post-Project.

39.    This decision also authorizes a site specific Forest Plan amendment to exempt

       Unit 31F (86 acres) from the Forest Plan standard to "maintain and improve"

       habitat standard for Brewer's sparrow, the Management Indicator Species

       (MIS) for sagebrush habitat (Plan Amendment 45).

40.    The Forest Service estimates that commercial timber harvest will last for a

       five year period, and noncommercial activities could occur over a ten year

       period.

41.    The Project is "financially inefficient" and will result in a net loss to the

       Forest Service, and the federal taxpayer, of $588,000.00.

GRIZZLY BEAR

42.    The grizzly bear is an ESA-listed threatened species that is present on the

       Forest.

43.    Grizzly bears have been observed in the Project area and "are known to

       occur" in the Project area.

44.    Over the past four years, 16 grizzly bears have been seen within one mile of

the Project area.

45.    The Project area is outside of the Yellowstone Grizzly Bear Recovery Zone

(Recovery Zone) but is within the Rock Creek "Bear Analysis Unit," which is

a unit that the Interagency Grizzly Bear Study Team deems to be

"biologically suitable and socially acceptable areas for grizzly bear

occupancy" outside of the Recovery Zone.

46.    The Project will increase the area with total motorized route density over 2

mi./sq. mi. in the Project area during the Project from 21.1% to 26.2%.

47.    The Custer National Forest does not have a Forest Plan standard for total

motorized access route density over 2 mi./mi.$^2$, but the limit on the Flathead

National Forest is 19%.

48.    The Project will decrease secure habitat in the Project area during the Project

from 61% to 54%.

49.    The Custer National Forest does not have a Forest Plan standard for secure

habitat, but the minimum required on the Flathead National Forest is 68%.

50.    The EIS does not disclose open motorized route density over 1 mi./mi.$^2$ in the

Project area, and it does not disclose linear open road density in the Project

area.

51.    The EIS acknowledges that the State of Montana's "Grizzly Bear

Management Plan for Southwestern Montana 2013 Final Programmatic EIS []

recommends that land-management agencies manage for an average open road density of one mile per square mile or less of habitat."

52. Likewise, the 1985 Biological Opinion/Incidental Take Statement for the Custer Forest Plan requires a road density of less than or equal to 1.0 mi./mi.[2] in all occupied grizzly habitat on the Forest.

53. The Project EIS also states: "[open motorized access route density] <= 1 mile per square mile . . . are levels considered adequate for grizzly bears to meet their biological requirements with low levels of disturbance and interaction with humans []."

54. The Forest Service fails to disclose the information necessary to determine whether the Project area complies with the 1.0 mi./mi.[2] open road density requirement.

55. Noise from equipment and added human presence associated with Project operations would increase disturbance impacts and potentially result in displacement of grizzly bears from the Project area.

56. Direct effects would also include displacement of individual grizzly bears from riparian habitats while Project activities are occurring.

57. The Project will reduce forested cover for grizzly bears by 1,071 acres, which is an 8% reduction. The effects are concentrated in a relatively small area around Red Lodge Creek, which may result in displacement of grizzly bears

from this immediate area.

58. Grizzly bears are highly dependent upon learned habitat; displacement into unknown territory could lead to sub-marginal nutrition, reduced reproduction, or greater exposure to adult predatory bears or human food sources, which could lead to human-caused mortality

59. Potential for displacement would occur throughout the length of the proposed Project activity (4 to 5 years for the commercial logging alone).

60. The EIS, Biological Assessment, and Biological Opinion/ Incidental Take Statement for the Custer Forest Plan were prepared in 1985 and address grizzly bear distribution at the time the Forest Plan was originally approved.

61. In 1985, the only area on the Forest with confirmed observations of grizzly bears in the prior 20 years had been the upper Stillwater drainage.

62. In 1985, of the total acres of occupied grizzly habitat on the Forest (110,511 acres), 94% occurred within the Absaroka-Beartooth Wilderness (103,724 acres).

63. In 1985, the other 6% of occupied grizzly habitat on the Forest occurred within an area that does not allow commercial logging or livestock grazing.

64. In the analyses and decision documents for the 1985 Custer Forest Plan, the Forest Service agreed to apply the "Yellowstone Guidelines" to all occupied grizzly bear habitat.

65.    The Guidelines require stratification of grizzly habitat into different

Management Situations:

- Management Situation 1:  "The area contains grizzly population

  centers (areas key to the survival of grizzly *where seasonal or year-*

  *long grizzly activity*, under natural, free-ranging conditions *is common*)

  and habitat components needed for the survival and recovery of the

  species or a segment of its population."  "Areas Where Grizzly

  Activity is Common" are "[a]reas where grizzly presence (evidenced

  by grizzly sightings, sign and kills) has been consistently documented

  over the years."

- Management Situation 2:  "Current information indicates that the area

  lacks distinct population centers; highly suitable habitat does not

  generally occur, although some grizzly habitat components exist and

  *grizzlies may be present occasionally.*

- Management Situation 3:  "*Grizzly presence is possible but*

  *infrequent.*"

- Management Situation 4: "*Grizzlies do not occur* in the area but

  habitat and human conditions make the area potentially suitable for

  grizzly occupancy, and the area is needed for the survival and recovery

  of the species."

- **Management Situation 5:**  *Grizzlies do not occur, or occur only rarely in the area.*

66. After mapping habitat as a Management Situation area, the Guidelines require the application of management direction specific to each Management Situation.

67. The purpose of the Management Situations is that "[t]hese management situations should be considered as interim management zones until official designation of critical habitat has been published."

68. No critical habitat for grizzly bears has been published.

69. The Forest Plan Biological Opinion/Incidental Take Statement also requires that until such time as a percent Habitat Effectiveness standard is developed for the grizzly, "an open road density of 1 mile of roads per square mile of habitat or less be maintained in [Management Situation 1]."

70. Based on the information and presence of grizzly bears in 1985, the Forest Service designated the upper Stillwater drainage (35,000 acres) as Management Situation 1 grizzly habitat, and designated the lower Stillwater drainage (100,000 acres) as Management Situation 2 grizzly habitat.  The estimated grizzly bear capacity for these two areas was four grizzly bears total.

71. In 1985, the agencies determined that Forest Plan implementation would not

adversely affect the grizzly bear because the agencies planned to follow the management directions from the Guidelines, and "[m]ost of the occupied habitat is within the Absaroka-Beartooth Wilderness and not available to development. The area outside is not classified commercial timber nor is it within any range allotment."

72. The agencies further found:  'The No Surface Occupancy stipulation in [Management Situation] 1, wilderness management in [Management Situation] 2, lack of commercial timber base, and the absence of livestock in 'occupied' areas should provide added assurances that grizzly bears and their habitats can be maintained on the Custer [National Forest]."

73. Thirty years have now passed and grizzly distribution has changed on the Custer National Forest.

74. Grizzly bear observations in and adjacent to the Beartooth Mountains have increased significantly over the past several years, with an increase from four documented individual bears in 2009 and zero in 2010, to 12 in 2011, 27 to 29 individuals in 2012, and a minimum of 43 individuals in 2013.

75. The Forest Service's 2015 map of suitable grizzly bear habitat shows a significantly changed condition from the Management Situation 1 and 2 grizzly habitat mapped for the 1985 Forest Plan:

//

**1985 Grizzly Habitat (bright green):**



**2015 Grizzly Habitat (blue lines):**



76.   Despite the movement of grizzly bears out of the Wilderness and into areas
      that allow commercial logging and grazing, the Forest Service has not
      reinitiated consultation on the Forest Plan to assess the impact of
      contemporary Forest Plan implementation on threatened grizzly bears.  The
      Project EIS and consultation do not remedy this omission.

77.   The Beaverhead-Deerlodge National Forest and Gallatin National Forest have
      already re-initiated consultation on their forest plans to address contemporary
      grizzly bear distribution.

78.   In 2010, the Kootenai National Forest was court-ordered to reinitiate
      consultation on the impacts of its forest plan on contemporary grizzly bear
      distribution.

79.   Defendants assert that the Project "may affect, but is not likely to adversely
      affect" the threatened grizzly bear based on the following rationale:  "1) The
      decrease in secure habitat during project implementation compared to the
      current condition would be negligible, and the amount of secure habitat would
      be slightly higher after project completion than currently[;] 2) Potential for
      displacement would occur throughout the length of the proposed project
      activity (4 to 5 years)[;] 3) Overall project effects on grizzly bear foraging
      habitat is expected to be slightly beneficial[;] 4) Loss of potential denning
      habitat would be negligible[;] 5) Cover reductions would affect grizzly bears

17

predominately in the Red Lodge Creek portion of the project area where
treatment units are concentrated in a relatively small geographic area, but
would not alter bear use of habitat when considered at the level of grizzly
bear home range size[;] 6) Design criteria would reduce potential for impacts
to grizzly bears[;] [and] 7) Cumulative effects from disturbance and
displacement, if any, are expected to be limited and temporary."

LYNX

80.     The Canada lynx is an ESA-listed threatened species that is present on the
        Forest.

81.     Canada lynx may be present in the Project area and lynx critical habitat is
        present in the Project area.

82.     In accordance with the Lynx Conservation Assessment and Strategy ( 2000),
        four Lynx Analysis Units were identified and mapped on the Custer National
        Forest, all on the Beartooth Ranger District.

83.     The majority of the Project area is within the Rock Creek Lynx Analysis
        Unit, but the northwestern corner of the Project area is in the Rosebud Lynx
        Analysis Unit.

84.     The Northern Rockies Lynx Management Direction (Lynx Amendment) was
        completed in 2007, and amended 18 Forest Service Northern Region Forest
        Plans, including the Custer Forest Plan.

85. In 2007, FWS prepared a Biological Opinion/Incidental Take Statement on the effects of the Lynx Amendment and determined that the Lynx Amendment was not likely to jeopardize lynx.

86. The 2007 Biological Opinion/Incidental Take Statement for the Lynx Amendment does not assess the impact of the Lynx Amendment on lynx critical habitat on National Forest lands.

87. In 2009, and again in 2014, FWS designated lynx critical habitat for lynx on National Forest lands.

88. The Project area is within lynx critical habitat Unit 5 - Greater Yellowstone Area.

89. In the Project EIS, the Forest Service states:  "The project area is considered critical lynx habitat. The effects analysis considers how proposed alternatives comply with the lynx management direction."

90. Since lynx critical habitat has been designated on National Forest lands, the agencies have not yet reinitiated and completed ESA consultation to address the impacts of the Lynx Amendment on lynx critical habitat on National Forest lands.

91. The Forest Service acknowledges that the Project will violate the Lynx Amendment unless the agency can demonstrate that the Project occurs within the wildland urban interface.  Thus, the agency asserts:  "All proposed

treatment units are located in a designated wildland urban interface, and therefore changes in lynx habitat are exempted from [Lynx Amendment] Standards VEG-S5 and VEG-S6."

92.    The Lynx Amendment and its Biological Opinion/Incidental Take Statement allow unrestricted logging in the wildland urban interface, which the agencies estimate to compose approximately 6% of the lynx habitat on National Forests.

93.    The Lynx Amendment mapped the wildland urban interface under several definitions – for both interface and intermix communities – and showed its relation to lynx habitat:



94.   The Lynx Amendment map indicates that not all of the Project area is within the wildland urban interface, which is indicated on the map with green, red, or blue shading, or in a circle around a town.

95.   The Lynx Amendment map displayed above also indicates the location of "lynx habitat" with gray/beige shading.

96.   The Forest Service map of "lynx habitat" for the Project showed a smaller portion of the Project area as containing lynx habitat:



97.   The legal definition of "lynx habitat" is found within the Lynx Amendment, which is part of the Custer Forest Plan (emphases added):

        Lynx habitat – Lynx habitat occurs in mesic coniferous forest
        that experience cold, snowy winters and provide a prey base of

21

> snowshoe hare. In the northern Rockies, lynx habitat generally occurs *between 3,500 and 8,000 feet* of elevation, and *primarily consists of lodgepole pine, subalpine fir, and Engelmann spruce*. It may consist of cedar-hemlock in extreme northern Idaho, northeastern Washington and northwestern Montana, or of Douglas-fir on moist sites at higher elevations in central Idaho. *It may also consist of cool, moist Douglas-fir, grand fir, western larch and aspen when interspersed in subalpine forests*. Dry forests do not provide lynx habitat. (LCAS)

98.     The dominant cover type in the Project area is early seral lodgepole pine mix. Spruce, subalpine fir and Douglas fir are regenerating and establishing underneath the lodgepole pine, creating multiple canopy layers.

99.     This mature lodgepole pine forest with a mix of Douglas-fir, spruce, or subalpine fir in the Project area fits the definition of "lynx habitat" as defined and adopted into the Custer Forest Plan under the Lynx Amendment.

100.    The Forest Service did not use the Lynx Amendment definition and map to disclose and analyze impacts to lynx habitat in the Project area.

101.    Instead , in 2013, the Custer National Forest produced an internal document, which it refers to as "Canfield 2013," that sets forth a new definition and mapping protocol for lynx habitat on the Custer National Forest.  This new map only includes spruce and subalpine fir, excludes all elevations below 6,000 feet, and excludes all forests that face south, southeast, southwest, and east.  This map was the map of "lynx habitat" the Forest Service used to analyze and disclose the impact of the Project on lynx.

102.   By remapping lynx habitat on the Custer National Forest, the Forest Service eliminated Lynx Amendment protections for 117,171 acres (50%) of the 232,689 total acres of "lynx habitat" on the Forest.

103.   In the Lynx Analysis Units affected by the Project area, the agency eliminated Lynx Amendment protections for 61% (41,929 acres) of the lynx habitat in the Rock Creek Lynx Analysis Unit and 67% (38,687 acres) of the lynx habitat in the Rosebud Lynx Analysis Unit.

104.   Under the Forest Service's remapping of lynx habitat, the agency asserts that only 9 acres of lynx habitat in the Project area are protected by Lynx Amendment standard VEG S5, and only 36 acres of lynx habitat in the Project area are protected by Lynx Amendment standard VEG S6.

105.   The agency does not disclose how much lynx habitat will be logged under the Lynx Amendment definition and map of lynx habitat.

106.   The Forest Service's remapping of lynx habitat on the Custer National Forest and attendant elimination of Lynx Amendment protections for 117,171 acres of lynx habitat on the Forest was not analyzed in an EIS or other NEPA analysis, and did not undergo ESA consultation.

107.   In the Project EIS, the agency did not clearly disclose to the public that it had decided to "map out of existence" and ignore  61% (41,929 acres) of the lynx habitat in the Rock Creek Lynx Analysis Unit and 67% (38,687 acres) of the

lynx habitat in the Rosebud Lynx Analysis Unit in its calculations and analysis of how the Project affects lynx habitat.

108.   The Project EIS does not address the impact on lynx from removing Lynx Amendment protections on tens of thousands of acres in the Custer National Forest and Project area.

109.   The Forest Service also uses its new definition of lynx habitat in its analysis of lynx critical habitat:  "The forest lynx habitat model was used to identify habitat that meets the criteria in [Primary Constituent Element] 1a and [Primary Constituent Element] 1c and [Primary Constituent Element] 1d."

110.   In lynx critical habitat, one of the primary constituent elements (Primary Constituent Element 1a) is boreal forest that provides snowshoe hare habitat.

111.   The most recent lynx critical habitat rule defines boreal forest that provides lynx habitat in the Northern Rocky Mountains:  "The dominant vegetation that constitutes lynx habitat in these areas is subalpine fir (A. lasiocarpa), Engelmann spruce, *and lodgepole pine* (Aubry et al. 2000, p. 379; Ruediger et al. 2000, pp. 4-8 -4-10). Within the boreal forest landscape, *lodgepole pine is seral to (i.e., is an earlier successional stage) subalpine fir and Engelmann spruce, which are climax forest habitat types*."  79 Fed. Reg. 54807 (September 12, 2014)(emphasis added).

112.   In the agency's analysis, it ignores the definition from the Federal Register

lynx critical habitat rule, and instead creates its own definition for "boreal forest" that matches its "lynx habitat" remapping protocol and excludes all but spruce and subalpine fir.

113.  Under the agency's redefinition of boreal forest, the agency asserts that only 37 acres of boreal forest that provide snowshoe hare habitat, i.e. lynx critical habitat Primary Constituent Element 1a, will be impacted by the Project.

114.  The agency also uses its own definition for Primary Constituent Element 1c - denning habitat, and Primary Constituent Element 1d - matrix travel habitat.

115.  Under its new remapping and definitions, the agency asserts that only 4 acres of matrix habitat (Primary Constituent Element 1d) and 244 acres of denning habitat (Primary Constituent Element 1c) will be affected by the Project.

116.  After remapping and redefining "lynx habitat" and the primary constituent elements of lynx critical habitat, as discussed above, Defendants assert that the Project "may affect, but is not likely to adversely affect" the threatened Canada lynx and lynx critical habitat.

117.  The Forest Service provides the following rationale for its Project determination for lynx:  "1) Effects to lynx forage would be negligible[;] 2) Changes in the acreage of each structural stage would be negligible[;] 3) The project is in compliance with the Northern Rockies Lynx Management Direction[;] and 4) There would be no cumulative effects."

118. The Forest Service provides the following rationale for its Project determination for lynx critical habitat:  "1) Reduction and removal of snowshoe hare habitat would be negligible on a scale proportionate to the large landscape used by lynx[;] 2) There would be no permanent loss or conversion of boreal forest[;] 3) Potential effects to the PCEs would be negligible[;] and 4) There would be no cumulative effects to lynx critical habitat."

ELK

119. Elk are a designated key species under the Custer Forest Plan.

120. The Project area provides fall, winter, and spring range for elk.

121. Two elk herds use the Project area:  Silver Run and Butcher Creek.

122. The EIS represents:  "The Custer Forest wide standard is to maintain or improve habitat for MIS (elk)."

123. The EIS represents that the most recent recommendation on hiding cover required for elk is Lyon et al. 1985 (Coordinating Elk and Timber Management 1985), which finds that "good cover" for elk is two-thirds of the total area, i.e. 66%.

124. The EIS states that 52% of the Project area is currently "hiding cover" for elk.

125. The EIS represents that the Project will cause a 6% decrease in hiding cover.

126.   The EIS represents that related to motorized routes, "habitat effectiveness" is defined as percentage of available habitat useable by elk outside the hunting season.

127.   The EIS represents that the best available science on habitat effectiveness requires the following:  "For areas intended to benefit elk summer range and retain high elk use, habitat effectiveness related to motorized routes should be 70% or greater."

128.   The Forest Service asserts that habitat effectiveness "can be directly correlated with open route density . . . ."

129.   Accordingly, in its calculation of habitat effectiveness, the Forest Service only included "[Forest Service] system routes (including trails) that receive motorized use by the public," and it excluded "[c]losed roads or low intensity, occasional private or administrative travel and management activity on routes closed to the public. . . ."

130.   When only these open roads are considered, habitat effectiveness is 55-60%.

131.   For the portion of the Silver Run elk herd within the Project area, the open road density is 1.14 mi./mi.$^2$ now, and will increase to 1.17 mi./mi.$^2$ during Project implementation.

132.   For the portion of the Butcher Creek elk herd within the Project area, the open road density is 0.96 mi./mi.$^2$ now, and will increase to 1.44-1.46

mi./mi.$^2$ during Project implementation.

133.   The EIS also represents that the agency analyzed security blocks for elk
security during hunting season, as proposed by Hillis et al (1991).

134.   In the security block analysis for the Project area, the agency buffered
publicly open Forest Service roads and publicly closed Forest Service roads
with "relatively frequent" motorized use by ½ mile, and added all blocks 250
acres or larger.

135.   The agency did not increase the road buffer to compensate for high densities
of closed roads, as recommended by the Hillis et al (1991).

136.   Hillis et al (1991) recommends at least 30% of an area be security blocks,
regardless of land ownership.

137.   The agency only included "public lands" and Forest Service roads in its elk
security block analysis.

138.   Under the agency's analysis, it estimates 35% security within the Silver Run
portion of the Project area, which will decrease to 34% during Project
implementation, and 41% security within the Butcher Creek portion of the
Project area, which will decrease to 32% during Project implementation.

139.   The Project would likely have some short-term negative impacts to big game
from short term disturbance/displacement due to noise from equipment and
added human presence.

140.  In the EIS, the Forest Service does not disclose the quantity and quality of habitat necessary to maintain elk viability.

141.  The EIS does not disclose the impact on elk viability from failing the 70% habitat effectiveness standard and failing the 2/3 hiding cover standard, and further decreasing both of those habitat protections during the Project.

142.  The EIS does not disclose whether the Project area would also fail the 30% security standard if the agency included all land ownerships and all roads in the analysis.

143.  The EIS does not explain how removing 6% of elk hiding cover will "maintain" habitat for elk as required by the Forest Plan.

SITE-SPECIFIC FOREST PLAN AMENDMENTS

144.  The Project includes two Project-specific Forest Plan amendments to exempt the Project from Forest Plan standards that would have prohibited activities authorized by the Project.

145.  The EIS does not provide a cumulative effects analysis on the environmental impacts to the Forest from site-specific amendments to the Forest Plan.

146.  The EIS does not disclose or discuss past site-specific Forest Plan amendments.

147.  The EIS does not disclose or discuss ongoing or reasonably foreseeable site-specific Forest Plan amendments.

WILDLAND URBAN INTERFACE DELINEATION

148.  The EIS represents:  "All areas proposed for treatment by the Greater Red

Lodge Area project reside within designated wildland urban interface."

149.  The EIS represents that the "most pertinent" community at risk category for

the Project area is "Category 2 - The Intermix Community."

150.  The EIS represents that intermix community is defined as "1 or more

structures per 40 acres."

151.  All areas proposed for treatment by the Project do not fall within the

Wildland Urban Interface as defined by the map the Forest Service provided

to the public in the EIS at Figure 3.1.3, which shows structure density at

structure per square mile:



152.  A number of the units are in areas that are not coded as yellow, orange, or

red.

153.   Additionally, the definition of intermix community as one structure per 40

acres equates to *16 structures per square mile.*

154.   The Forest Service's EIS map, Figure 3.1.3, shows a yellow coding that

represents only 1-5 structures per square mile; 1-5 structures per square mile

does not indicate intermix community because it does not indicate a density

of one structure per 40 acres.

155.   Any units within yellow coded areas only are not within the wildland urban

interface.

156.   The Forest Service's EIS map, Figure 3.1.3, also shows an orange coding that

represents 5-25 structures per square mile, which may or may not indicate

intermix community:  If the density is 5-15 structures per square mile, the

area would not be intermix community; if the density is 16-25 structure per

square mile, the area would be intermix community and would therefore

qualify as wildland urban interface.

157.   Any units within orange coded areas that have fewer than 16 structures per

square mile are not within the wildland urban interface.

158.   All areas proposed for treatment by the Project do not fall within the

Wildland Urban Interface as defined by the Forest Service's "HFRA WUI"

map:

31



159. All areas proposed for treatment by the Project do not fall within the

Wildland Urban Interface as defined by the Forest Service's Northern

Rockies Lynx Management Direction map.  The red, blue, and green areas,

and the circled areas around towns, set the wildland urban interface under all

definitions.  The gray/beige shaded areas are "lynx habitat."



POST-EIS CHANGED CONDITIONS

160. On March 28, 2015, the West Fork Road Fire started on private lands along West Fork Rock Creek Road, adjacent to proposed Project units that are part of the Greater Red Lodge Project.

161. The fire entered the Project area and burned portions of Units 29f, 30f, 31f, 32f, and 37t (about 170 acres).

162. Burn intensities were highly variable, ranging from unburned with spots to high intensity. The fire burned at lower elevations on the Beartooth Face in grassland/sagebrush habitat that had experienced conifer colonization and moved upslope and burned in forested stands comprised of Douglas-fir and lodgepole pine.

163. The agency acknowledges the wildfire in the Record of Decision for the Project, but did not prepare a supplemental EIS to address whether there is still a purpose and need for logging and/or burning in the affected units in light of this wildfire.

POST-EIS & POST-COMPLAINT ANALYSIS

164. After the original Complaint was filed in this case, USFS provided FWS with an "updated" Biological Assessment for the Project on August 13, 2015.

165. FWS concurred with the USFS conclusions in the new Biological Assessment on August 31, 2015.

166.  USFS provided the new consultation documents to the Plaintiffs on September 16, 2015.

167.  The updated Biological Assessment again reached a "not likely to adversely affect" conclusion for lynx, lynx critical habitat, and grizzly bears.

168.  The Forest Service's new rationale for its lynx conclusion follows: "1) Effects to winter snowshoe hare habitat (lynx foraging) would be minor compared to the availability within the affected LAUs. 2) Effects to denning habitat are minor relative to the amount available. 3) The project is in compliance with the Northern Rockies Lynx Management Direction. 4) There would be no cumulative effects."

169.  In the lynx analysis section of the updated Biological Assessment, the Forest Service references "Appendix 2" as a "summary" of and "rationale" for the agency's remapping of lynx.

170.  The Appendix 2 cited in the updated Biological Assessment was not in the original Project Biological Assessment or Project EIS.

171.  In the lynx critical habitat section of the updated Biological Assessment, using the agency's remapping of lynx habitat, the Forest Service asserts that only 26 acres of PCE1a, 196 acres of PCE1c, and 4 acres of PCE 1d will be logged by the Project.

172.  The Forest Service's new rationale for its lynx critical habitat conclusion

follows:  "1) Modification of snowshoe hare habitat would be very minor on a

scale proportionate to the large landscapes used by lynx. 2) There would be

no permanent loss or conversion of boreal forest. 3) Effects to the PCE

components are very small compared to availability 4) Forest roads and the 4

acres of matrix habitat is affected by the GRLA project within the critical

habitat boundary would not impede lynx travel between patches of boreal

forest. 5) There is no cumulative effect on lynx critical habitat."

173. In the grizzly section of the updated Biological Assessment, the agency still

does not disclose linear open road density or open motorized route density

over 1 mi/sq mi at the scale of the Project area.

174. In the grizzly section of the updated Biological Assessment, the agency states

for the first time that the Project area "most closely falls into the description

for MS-2."  This classification was not disclosed in the Project EIS.

175. In the grizzly section of the updated Biological Assessment, the agency also

states for the first time that "Appendix 3 provides the details of how the

project complies with forest plan direction for grizzly bears."  The discussion

in Appendix 3 was not included in the Project EIS.

176. The Forest Service's new rationale for its grizzly conclusion follows:  "1) The

project does not affect OMARD and is not expected to impact denning

habitat. 2) At the BAU scale, the project has a minor and temporary effect on

TMARD and secure habitat (1 %) during project implementation. 3) At the BAU scale, the excellent existing conditions (TMARD and secure habitat) are improved upon completion of the project because temporary and other roads used to implement the project are decommissioned. 4) At the project scale, TMARD (>2 mi/sq mi) increases (5%) and secure habitat decreases (7%) during project implementation, which could result in local displacement of individual grizzly bears. 5) At the project scale, TMARD would be lower and the amount of secure habitat would be slightly higher after project completion than currently. 6) Overall project effects on grizzly bear foraging habitat are expected to be slightly beneficial once shrubs and grasses and aspen recover in cutting units (1-5 years). 7) Cover reductions could displace grizzly bears predominately in the Red Lodge Creek portion of the project area where treatment units are concentrated in a relatively small geographic area, but would not alter bear use of habitat when considered at the level of grizzly bear home range size (BAU). There is also a possibility that forage created in ears post -treatment. 8) Design criteria (such as Food Storage) would reduce potential for grizzly bears to be removed or killed from human conflicts or food rewards. 9) Cumulative effects from cover reductions are expected to be limited to local areas. 10) The project complies with applicable Custer Forest Plan direction."

177. Appendix 2 to the updated Biological Assessment discloses that the agency's remapping of lynx habitat had the effect of dramatically reducing the 232,689 acres mapped as lynx habitat in 2007 to only 112,638 acres mapped as lynx habitat on the Custer National Forest, i.e. a 52% reduction that represents the elimination of Lynx Amendment protections on 120,051 acres.

178. Neither the updated Biological Assessment nor Appendix 2 to that document cite or reference any NEPA analysis or ESA consultation that was completed to authorize this remapping of lynx habitat and significant removal of Lynx Amendment protections on over half of the lynx habitat on the Custer National Forest.

179. Appendix 3 to the updated Biological Assessment is entitled "Compliance of the [Greater Red Lodge Area] project with 1979 guidelines for Grizzly Bears in the Greater Yellowstone Ecosystem contained in the publication Management Involving Grizzly Bears in the Greater Yellowstone Area (Compliance with the Custer Forest Plan of1986.") This analysis is not in the EIS for the Project.

180. Appendix 3 admits: "The Greater Red Lodge area was not included in any management situation in the 1986 Custer Forest Plan as the area was not occupied. The area has been recently occupied by grizzly bears."

181. Appendix 3 decides: "The Greater Red Lodge project area, although it has

elements of Management Situation 3 (high human presence) may better fall

under the description of Management Situation 2 in the 1979 publication

*Management Involving Grizzly Bears in the Greater Yellowstone Area*

('Yellowstone Guidelines')."

182.   The agency's decision to amend the grizzly bear Management Situation

designations for the Custer National Forest (as set out in the 1986 Forest

Plan) is not accompanied by a NEPA analysis or ESA consultation for this

Forest Plan amendment.

VII.  CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

<u>The agencies' analyses, actions ,and omissions regarding the grizzly bear violate the
ESA, NFMA, NEPA, and the APA.</u>

183.   All previous paragraphs are incorporated by reference.

184.   The most recent Biological Opinion/Incidental Take Statement addressing the

impact of Custer Forest Plan implementation on grizzly bears was produced

in June 1985, which was over 30 years ago.  At that time grizzly bears only

occurred within a Wilderness area (94%) and in an area where no logging or

grazing was permitted (6%).  The agencies' analysis of impacts to grizzly

bears on the Custer National Forest was based on the premise that activities

such as logging and grazing would therefore not negatively impact grizzly

bears.

185.   In the past 30 years, grizzly bear distribution on the Custer National Forest has significantly changed.  Grizzly bears now regularly occupy areas on the Custer National Forest where logging and grazing occur.  This is a significantly changed condition.

186.   In the EIS, the agency repeatedly represents to the public that there are no Forest Plan standards to protect grizzly bears in these areas:

•       "There are no standards for motorized route density inside or outside the Recovery Zone;"

•       "There are no standards in the Conservation Strategy for management of grizzly bears outside of the [Grizzly Bear Recovery Zone;"

•       "There are no 'standards' for road density for grizzly bear as a listed species. The conservation strategy standard (adopted as a forest plan amendment but only binding if the bear is delisted) is to maintain secure habitat at or above 1998 baseline levels within the Primary Conservation Area (PCA). The project area is OUTSIDE of the PCA. There are no standards in the conservation strategy for habitat outside the PCA (see also response to 276d)."

187.   Adverse impacts and unpermitted take of grizzly bears are likely occurring in these areas of occupied grizzly bear habitat for which there are no standards

and no forest plan consultation.

188. The agencies must reinitiate and complete consultation on the impact of Custer Forest Plan implementation on grizzly bears where they occur today. The Beaverhead-Deerlodge National Forest and Gallatin National Forest have already re-initiated consultation on their forest plans to address contemporary grizzly bear distribution.  In 2010, the Kootenai National Forest was court-ordered to reinitiate consultation on the impacts of its forest plan on contemporary grizzly bear distribution.

189. Until the agencies reinitiate and complete reconsultation on the Custer Forest Plan, the Project must be enjoined.

190. Alternatively, if the 1985 Biological Opinion/Incidental Take Statement applies to all occupied grizzly habitat, then the Forest Service must designate Management Situations for all current grizzly habitat on the Forest and implement the management direction required under the Guidelines.  For the Project area, the Forest Service must designate the area as Management Situation 1 because grizzly use of the area is common, and the agency must demonstrate Project area compliance with the road density standard for Management Situation 1, which is 1.0 miles/square mile open road density. Until the Forest Service complies with these requirements, the Project must be enjoined.

191.   As noted above, in response to this litigation, the agency attached an
       appendix to a revised Biological Assessment for the Project that purports to
       make a formal Management Situation designation for the Project area.  There
       is no NEPA analysis or ESA analysis for this attempt to amend the Custer
       Forest Plan.  The agency's attempt to amend the Custer Forest Plan
       Management Situation designations without an actual Forest Plan amendment
       and attendant NEPA analysis and ESA consultation violates NFMA, NEPA,
       and the ESA.

192.   Moreover, the agency attempts to use its appendix to its revised Biological
       Assessment to demonstrate that the Project complies with the law.  In the
       appendix, the agency effects a sea change from its prior assertions that there
       are no standards for grizzly bears, and now acknowledges that there are such
       standards.   The agency's new acknowledgement and analysis of standards
       and legal requirements for grizzly bears must be contained in the EIS and
       submitted to the public for notice and comment during the NEPA process; the
       agency cannot satisfy its legal obligations under NEPA and NFMA by
       providing this disclosure and analysis to FWS in a post-hoc appendix to a
       revised ESA consultation document.

193.   The EIS and best available science Schwartz el al (2010) acknowledge open
       road density as a key factor that impacts grizzly bears.

194.   The open road density threshold for grizzly bears is 1.0 miles/square mile.

195.   The EIS does not disclose the open road density in the Project area, despite multiple repeated public requests.  The agency provides no rationale in the EIS for refusing to disclose this calculation.  The agency's refusal to disclose this key factor for grizzly bear habitat constitutes a failure to take a hard look and frustrates the public's ability to consider and address this issue.

196.   The Project will cause at least some adverse effects to grizzly bears.  Existing road density is already causing adverse effects, and the Project will remove quantifiable acres of grizzly cover, will decrease secure habitat during the Project by a quantifiable amount, will increase total motorized route density over 2 miles/square mile in the Project area by a quantifiable amount during Project implementation, and will displace grizzlies during the Project.  The agencies fail to disclose the definition of "likely to adversely affect;" these impacts fall within the scope of that definition.

197.   For the reasons set forth above, the agencies' analyses, actions ,and omissions regarding grizzly bears violate the ESA, NFMA, NEPA, and the APA.

SECOND CLAIM FOR RELIEF

The agencies' analyses, actions ,and omissions regarding lynx and lynx critical habitat violate the ESA, NFMA, NEPA, and the APA.

198.   All previous paragraphs are incorporated by reference.

199.   At the time the Lynx Amendment was approved and went through ESA consultation, there was no lynx critical habitat designated on National Forest lands.

200.   The designation of lynx critical habitat on National Forest lands in 2009 constitutes a changed condition that requires reinitiation of consultation on the Lynx Amendment according to the U.S. Court of Appeals for the Ninth Circuit.  *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1085 (9th Cir. 2015).

201.   The agencies must reinitiate and complete ESA consultation on the impact of the Lynx Amendment on lynx critical habitat across all Region One National Forests.

202.   Until re-consultation on the Lynx Amendment is complete, the Project must be enjoined because it falls within lynx critical habitat that will be logged under exceptions authorized by the Lynx Amendment that have never been assessed in an ESA consultation to determine the impact on lynx critical habitat at landscape-level scale.

203.   In 2013, the Forest Service chose to remap lynx habitat on the Forest, thereby removing Lynx Amendment protections on over 117,000 acres of the Custer National Forest.

204.   There is no NEPA analysis or ESA consultation for the 2013 remapping, either in a stand-alone format, or at a cumulative landscape-scale within the analyses for the Project.

205.   The Forest Service's remapping of lynx habitat on the Custer National Forest constitutes a major federal action under NEPA because it is a document prepared by the agency that guides or prescribes uses of federal resources, upon which future agency actions will be based.  The new mapping re-categorizes thousands of acres of lynx habitat out of existence and thereby paves the way for future projects to authorize logging and other activities in those areas, even if those activities are prohibited under the Lynx Amendment.

206.   The Forest Service's remapping of lynx habitat on the Custer National Forest is also an agency action under the ESA.  Agency action under the ESA is more broad than major federal action under NEPA and includes all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies.

207.   Accordingly, the agencies must prepare NEPA analysis and ESA consultation for the decision to remap lynx habitat on the Custer National Forest and remove protections for over 117,000 acres of lynx habitat.

208.   The most logical way to conduct this analysis is with a Forest Plan

amendment to amend the Custer Forest Plan's adoption of the Lynx Amendment;  this is the route chosen by the adjacent Caribou-Targhee National Forest to adopt its own recent remapping of lynx habitat.

209.  Until the agencies complete ESA and NEPA analysis for the 2013 remapping of lynx habitat on the Custer National Forest, the Project must be enjoined because the Project analysis of impacts to lynx and lynx critical habitat is premised upon the acceptance and implementation of the new map of lynx habitat.  The Project unlawfully tiers to the new map because there has been no NEPA analysis or ESA consultation for that remapping yet.

210.  The agencies' analyses ignore the definitions from the Lynx Amendment and lynx critical habitat rule, and fail to fully and fairly disclose and meaningfully discuss the issue of remapping lynx habitat in the EIS and ESA consultation. The EIS and ESA consultation documents do not disclose that the analysis of impacts to lynx and lynx critical habitat is completely premised on a new map that eliminates over 60% of the lynx habitat in the affected Lynx Analysis Units.  The EIS and ESA consultation documents do not disclose the impacts on lynx from removing over 60% of its habitat from protection.  The EIS and ESA consultation documents do not acknowledge or demonstrate compliance with the map or definition of lynx habitat from the Lynx Amendment, or acknowledge or disclose that the Lynx Amendment itself maps a larger area

as lynx habitat, including more acres that will be logged by the Project.  The EIS and ESA consultation documents do not disclose how much lynx habitat would be impacted by the Project according to the map of lynx habitat from the Lynx Amendment.  The EIS and ESA consultation documents also fail to acknowledge the definition of boreal forest from the lynx critical habitat rule, and disclose how many acres of lynx critical habitat would be logged under that definition.

211.   As noted above, after this lawsuit was filed, the Forest Service prepared a revised Biological Assessment with an appendix that mentions that the agency remapped lynx habitat and  removed over 50% of the habitat from the lynx habitat classification.  The inclusion of this admission in an appendix to a post-hoc consultation document does not remedy the legal violations discussed above - there is still no ESA consultation or NEPA analysis for the remapping decision itself, which is both an agency action under the ESA and a major federal action under NEPA.

212.   The Project will cause at least some adverse effects to lynx and/or lynx critical habitat.  The Project will remove quantifiable acres of lynx habitat, displace lynx during the Project, and alter the ability of lynx to use habitat for decades due to their avoidance of clearcuts and preference for winter habitat in mature, multi-story forests.  The Project also relies on exemptions from the

Lynx Amendment.  The agencies fail to disclose the definition of "likely to adversely affect;" these impacts fall within the scope of that definition.

213.   The Forest Service's use of the Lynx Amendment exemption for logging in the wildland urban interface is unlawful because all of the Project units do not fall within the wildland urban interface.  Thus, the logging of lynx habitat violates the Forest Plan and NFMA.

214.   For the reasons set forth above, the agencies' analyses, actions ,and omissions regarding lynx and lynx critical habitat violate the ESA, NFMA, NEPA, and the APA.

THIRD CLAIM FOR RELIEF

The Forest Service's failure to provide a cumulative effects analysis on the impact of past, present, and reasonably foreseeable site-specific Forest Plan amendments across the Forest violates NEPA and NFMA.

215.   All previous paragraphs are incorporated by reference.

216.   When addressing "site-specific" amendments to a forest plan, the cumulative impact analysis must address forest-wide impacts because otherwise the Forest Service will be free to ignore standards throughout the forest on a piecemeal basis, without ever having to evaluate the amendments' cumulative environmental impacts.

217.   The Forest Service authorized two site-specific Forest Plan amendments for

the Project in order to exempt the Project from complying with Forest Plan

standards.

218.   The EIS does not provide the public with a cumulative effects analysis that

discloses past, present, and reasonably foreseeable site-specific Forest Plan

amendments across the Forest and the cumulative impact of all of those

Forest Plan exemptions on the Forest.

219.   The Forest Service's failure to provide the public with a Forest-wide

cumulative effects analysis for the site-specific Forest Plan amendments in the

EIS violates NEPA, NFMA, and the APA.

## FOURTH CLAIM FOR RELIEF

<u>The agencies' analyses, actions ,and omissions regarding elk violate the ESA,</u>

<u>NFMA, NEPA, and the APA.</u>

220.   All previous paragraphs are incorporated by reference.

221.   In the Project EIS & ROD, the Forest Service acknowledges that  the Forest

Plan states that the Forest has the responsibility to manage the land to

maintain at least viable populations of existing native species.

222.   Elk are an existing native species on the Forest.

223.   The Forest Plan also mandates that the agency maintain elk habitat.

224.   The EIS does not provide a clear discussion on the quantity of elk habitat

necessary to maintain elk viability.

225.   The EIS discusses three habitat parameters:  hiding cover, habitat effectiveness (analyzed as open road density) outside the hunting season, and security blocks (during hunting season).

226.   The Project area currently fails the 66% threshold for good hiding cover, and fails the 70% habitat effectiveness for summer range.

227.   The agency does not explain how it could be ensuring elk viability if it is failing two out of three parameters.

228.   Contrary to the studies by Lyon, Christensen, and Hillis, the agency only included open Forest Service routes in the habitat effectiveness calculation, only addressed public lands in the security block calculations, and ignored the impact of closed roads on the necessary security block buffer zone.

229.   The Forest Service's failure to address the impact of all roads on all land ownerships in its calculations represents a failure to take a hard look and failure to fully and fairly disclose Project impacts to the public.

230.   The removal of 6% of elk hiding cover by the Project violates the Forest Plan requirement to "maintain" elk habitat.

231.   For the reasons set forth above, the agencies' analyses, actions ,and omissions regarding elk violate NFMA, NEPA, and the APA.

FIFTH CLAIM FOR RELIEF

The Forest Service's analysis of the wildland urban interface violates NFMA,

NEPA, and the APA.

232.   All previous paragraphs are incorporated by reference.

233.   The EIS represents that all Project units are within the wildland urban interface, and that this designation is a primary driver for this Project.

234.   The EIS also represents that the wildland urban interface designation allows the agency to authorize logging in lynx habitat that would otherwise be prohibited under the Lynx Amendment.

235.   EIS Figure 3.1.3 is the map the Forest Service provides in the EIS to demonstrate that the Project is within a wildland urban interface, but that map does not show that all of the Project units are in the wildland urban interface.

236.   Additionally, the Forest Service's own "HFRA WUI" map does not show that all of the Project units are in the wildland urban interface.  This map was not disclosed to the public in the EIS.

237.   Additionally, the Lynx Amendment wildland urban interface map does not show that all of the Project units are in the wildland urban interface.  This map was not disclosed to the public in the EIS.

238.   The EIS does not take a hard look at this issue and fully and fairly disclose and discuss the evidence that all of these Project units are not in the wildland urban interface as that term is legally defined.

239.   The Forest Service's failure to take a hard look at this issue, and its use of the

Lynx Amendment WUI exemption where it does not apply, violate the APA, NEPA, and NFMA.

SIXTH CLAIM FOR RELIEF

<u>The Forest Service's failure to prepare a supplemental EIS to address the impact of the 2015 wildfire on the Project area violates NEPA and the APA.</u>

240. All previous paragraphs are incorporated by reference.

241. After the Project EIS was completed and all public comment periods had ended, a wildfire burned through part of the Project area.

242. The Forest Service has not prepared a supplemental EIS to address the impacts of the wildfire on the Project, and to determine whether all of the Project activities are still necessary in light of the primary Project purpose to reduce wildfire risk.

243. The agency's failure to prepare a supplement EIS violates NEPA and the APA.

**VIII.  RELIEF REQUESTED**

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A. Declare that the Project violates the law;

B. Enjoin implementation of the Project;

C. Award Plaintiffs their costs, expenses, expert witness fees, and reasonable

51

attorney fees under the ESA and/or under EAJA; and

D.       Grant Plaintiffs any such further relief as may be just, proper, and equitable.


Respectfully submitted this  10th Day of December, 2015.


                    */s/ Rebecca K. Smith*
                    Rebecca K. Smith
                    PUBLIC INTEREST DEFENSE CENTER, PC

                    Timothy M. Bechtold
                    BECHTOLD LAW FIRM, PLLC

                    Attorneys for Plaintiffs